# IN THE COURT OF APPEALS OF IOWA

No. 23-1951
Filed January 9, 2025

**STATE OF IOWA,**
       Plaintiff-Appellee,

**vs.**

**SEAN CHRISTOPHER BRIGHT,**
       Defendant-Appellant.
_____

       Appeal from the Iowa District Court for Linn County, Elizabeth Dupuich, Judge.


       A defendant convicted for failing to appear at sentencing in a separate criminal matter appeals the district court's denial of his motion for new trial. **AFFIRMED**.


       Webb L. Wassmer of Wassmer Law Office, PLC, Marion, for appellant.

       Brenna Bird, Attorney General, and David Banta, Assistant Attorney General, for appellee.


       Considered by Greer, P.J., Langholz, J., and Telleen, S.J.*

       *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2025).

**TELLEEN, Senior Judge.**

### I.   Background

This case begins where another was supposed to end.  In 2022, Sean Bright pled guilty to a criminal charge for possessing a firearm.  Bright was released on bond pending a sentencing hearing set for January 3, 2023, in Linn County.  But when that day arrived, he wasn't in the courtroom.  According to Bright, he was somewhere in northern Georgia, out of gas and short on money.  The State says he was hiding.  A jury found Bright guilty of failing to appear in violation of Iowa Code section 811.2(8) (2023).  Bright appeals the denial of his motion for new trial, arguing the weight of the evidence shows his absence was involuntary.

### II.   Discussion

Our rules of criminal procedure permit a district court to order a new trial if the jury's verdict is contrary to the weight of the evidence.  Iowa R. Crim. P. 2.24(2)(b)(7) (2023).  A new trial is appropriate "only in the extraordinary case in which the evidence preponderates heavily against the verdict rendered."  *State v. Ernst*, 954 N.W.2d 50, 60 (Iowa 2021).  "The question for the court is not whether there was sufficient credible evidence to support the verdict rendered or an alternative verdict, but whether a greater amount of credible evidence suggests the verdict rendered was a miscarriage of justice."  *State v. Ary*, 877 N.W.2d 686, 706 (Iowa 2016) (cleaned up).  In answering that question, the district court may weigh the evidence and consider the credibility of witnesses.  *Id.*  Our review is for abuse of discretion.  *Ernst*, 954 N.W.2d at 60.

A criminal defendant released pending entry of judgment may be convicted of a new offense if the defendant "willfully fails to appear" in court as ordered.  Iowa

Code § 811.2(8). We have interpreted a willful failure to mean "a deliberate or intended violation, as distinguished from an accidental, inadvertent, or negligent violation of an order." *State v. Brown*, No. 01-0742, 2002 WL 22184, at *1 (Iowa Ct. App. Jan. 9, 2002) (per curiam). Bright contends the trial evidence weighs heavily against a finding of willfulness—primarily based on his own testimony about a series of mishaps that left him stranded out-of-state on the day of his sentencing. We begin with Bright's version of events.

### 1. Bright's Account

Bright testified that on December 26, 2022, he decided to take a trip to Florida. He wanted to cross skydiving off his "bucket list." Bright and his wife had been saving for a getaway, and so they boarded their vehicle with $1800 cash and left Cedar Rapids for the coast. By the 28th, they had reached Alabama. It was there that the couple realized both of their phones were missing. According to Bright, they hadn't been "using [the phones] at all, but [they] did tear the truck apart" in an unsuccessful attempt to find them.

Bright and his wife arrived in the Viero Beach area on December 31. Some fellow skydivers at the hotel where they stayed told them about a jump site in nearby Sebastian, Florida. The next morning—New Year's Day—Bright took his leap. A commemorative certificate was admitted at trial. The thrill was over by noon, and the couple turned back toward Iowa. To Bright's recollection, the return trip from Florida was supposed to take about seventeen hours. He planned to be back by the afternoon of January 2, well in advance of his January 3 sentencing. He testified that he "fully" and "absolutely" intended to be in court.

Bright claims misfortune intervened. According to his testimony, the couple stopped for gas just past the Georgia border, and they learned their money was missing. Bright's account as to what happened next was muddled. On direct examination, he alleged the "first thing" he did was pawn a laptop for $50 of gas money. When asked on cross about how he found a pawn shop open on New Year's Day, Bright revised his account—explaining that, after learning the money was gone, he and his wife spent the night in a Walmart parking lot before setting out for a pawnshop on the morning of January 2.

Bright testified that when the laptop money ran dry, he and his wife pawned some jewelry for another three-quarters tank, which carried them as far as northern Georgia. But at that point, the couple was "dead in the water." They were out of gas, and they "didn't have really anything else to get rid of." According to Bright, they spent ten days stuck in place. Neither Bright nor his wife ever attempted to alert Bright's attorney or seek the assistance of his friends or relatives in Iowa. Eventually, the couple was able to sell some camping gear for nearly enough money to make it home. A handout from a gas station owner took them the last 100 miles. Bright was taken into custody forty-five minutes after returning to Cedar Rapids.

### 2. The State's Case

The State's lead witness was Tammy O'Connor, whose company posted the $5000 bond securing Bright's pre-sentence release. O'Connor testified regarding the routine reminders her office sent Bright and his wife by text message regarding approaching court dates in Bright's case. Bright had been "very good about checking in." But when O'Connor sent Bright a message on December 30

to confirm his upcoming sentencing, he didn't respond. O'Connor tried to reach Bright by phone. The parties agree that Bright called O'Connor on December 31 to confirm he was aware of his court date.

O'Connor testified that, on January 2, several of Bright's friends and family members informed her that he had sold his truck and left town for Florida. O'Connor also saw a Facebook post describing the couple as missing persons. Concerned that Bright planned to skip bail, O'Connor circulated her own post stating she believed Bright was "on the run" and requesting information as to his whereabouts. O'Connor's post was shared over 900 times. On January 19, she received a tip that Bright was back in Cedar Rapids. O'Connor located Bright the same day and turned him over to police.

The State also introduced recordings of jail calls placed by Bright on the day of his arrest. In one of the calls, Bright's daughter informs him she was questioned by federal investigators. Bright asks, "you didn't tell them anything, did you?" In another, Bright's wife—who was also questioned—tells Bright that the FBI knew about a TracFone with a Florida number that Bright used to contact family and friends in Iowa. He then states, "I told them we were on vacation," and "I'm sticking to that; we were not running." Bright's wife assures him that she told the FBI "the only reason we went back and forth from Florida is because we were out of money and looking for work."

### 3. Weight of the Evidence

The district court found that the weight of credible evidence supported Bright's conviction, noting Bright's "own testimony demonstrated that he willfully failed to appear." On appeal, Bright argues the district court improperly discredited

his account. He contends the State offered no evidence to contradict his testimony about losing his cell phone and gas money. We disagree.

Key to Bright's defense was an implicit assertion that he had no ability to alert his attorney, the bond company, or anyone else about his empty tank predicament. However, O'Connor testified that she heard from Bright on December 31—two days after he and his wife allegedly lost their cell phones.[1] And during a recorded conversation, Bright and his wife discussed calls they made from a TracPhone with a Florida number. Even assuming the couple had no phone of their own, Bright apparently declined to ask anyone for help. That decision is irreconcilable with his "absolute[]" intention to appear in court. *Cf. Brown*, 2002 WL 22184, at *1 (noting on review for sufficiency of the evidence that a defendant's failure to seek other transportation in lieu of his broken-down car supported a verdict for willful failure to appear).

There are more problems with Bright's story. For instance, the math doesn't add up. Bright testified he was marooned for ten days beginning on January 2. But that leaves an additional week unaccounted for between the beginning of his return trip on January 1 and his arrival in Cedar Rapids on January 19. In a recorded call, Bright's wife indicates the couple went "back and forth from Florida" looking for work—which is contrary to Bright's account of reaching northern Georgia on fumes. Other dents in Bright's credibility include his mixed-up chronology of events following the discovery of the missing money and his failure

---

[1] At trial, Bright sought to rebut O'Connor's testimony by introducing a call log from his cell phone carrier. That exhibit doesn't do him any favors. It shows three outgoing texts from Bright's phone between December 31 and January 3. Phone activity after January 3 was excluded from the log.

to explain why he and his wife waited ten days to sell the camping equipment that paid their way home.

Bright urges us to focus on the fact that he had "no incentive to avoid sentencing." Undisputedly, he faced only two years' probation under his plea deal for the gun charge. The State suggests Bright may have been running from bigger problems, citing federal investigators' interest in his disappearance. But it is unnecessary to speculate about Bright's reasons. A worthy motive is not an element under section 811.2(8). And even if the record raises questions about why Bright would run, those questions do not resolve the several incongruencies in his testimony.

Ultimately, our role in this case "is limited to a review of the exercise of discretion by the trial court, not of the underlying question of whether the verdict is against the weight of the evidence." *State v. Heard*, 934 N.W.2d 433, 444–45 (Iowa 2019) (citation omitted). We find the district court was well within its discretion to discount Bright's version of events and find the weight of credible evidence supported the jury's conclusion that Bright willfully failed to appear.

### 4. Conclusion

This is not the rare "case in which the evidence preponderates heavily against the verdict rendered." *Ary*, 877 N.W.2d at 706. If the evidence tips against anything, it is against Bright's account. The district court did not abuse its discretion in denying Bright's motion for a new trial.

**AFFIRMED.**